ORIGINAL
FILED
E-filing 2010 OCT -8 P 1:19
Paid $1

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N.D. CA. SAN JOSE

1  BLECHER & COLLINS, P.C.
   Maxwell M. Blecher (State Bar No. 26202)
2   mblecher@blechercollins.com
   Harold R. Collins, Jr. (State Bar No. 371140)
3   hcollins@blechercollins.com
   515 South Figueroa Street, Suite 1750
4  Los Angeles, California 90071-3334
   Telephone: (213) 622-4222
5  Facsimile: (213) 622-1656

ADR

6  Attorneys for Plaintiff
   Digital Sun

7

8                 UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12 DIGITAL SUN, a California          )  CASE NO.
   corporation,                       )  CV10- 4567
13                                    )
              Plaintiff,              )  COMPLAINT FOR DAMAGES
14                                    )  AND INJUNCTIVE RELIEF
        vs.                           )  1) SECTION TWO OF THE
15                                    )  SHERMAN ACT - ATTEMPTED
   THE TORO COMPANY, a Delaware       )  MONOPOLIZATION;
16 corporation,                       )  2) FRAUD; and
                                      )  3) CAL. BUS. & PROF. CODE §
17           Defendant.               )  17200 - UNFAIR COMPETITION
                                      )
18                                    )  (DEMAND FOR JURY TRIAL)
                                      )

19       Plaintiff Digital Sun ("DS") files this Complaint against defendant

20 The Toro Company ("Toro") to secure damages and injunctive relief, and

21 demanding trial by jury, claims and alleges as follows:

22                              I.

23                     **SUMMARY OF THE CASE**

24       1. Defendant Toro is a leading worldwide provider of turf and landscape

25 maintenance equipment, including irrigation equipment. It maintains a network of

26 professional distributors, dealers and retailers in about eighty (80) countries

27 around the world.

28       2. Traditionally, irrigation systems, which controlled the dispensing of

- 1 -

COMPLAINT

water, were controlled by wire timers that are complex, expensive and have limited capabilities. In 2003, Plaintiff DS, announced a new, exciting product – a wireless sensor technology for wireless monitoring and control that utilized breakthrough technology. Digital Sun's new wireless electronic soil sensor system measures the water content in the soil of a lawn to determine exactly when a lawn needs to be watered and then automatically turns on the watering system for the precise amount of time needed to replenish the soil. The Digital Sun wireless sensor can easily be integrated into and connected with any existing automatic sprinkler system by anyone in a matter of minutes. Once installed, it will save thousands of gallons of water that under a conventional wired, timed system will water on days when water is not really needed. Accordingly, Digital Sun's wireless system is a dramatic technological breakthrough because it provides a highly effective way to reduce the water wasted by present wired, timed irrigation systems and thereby reduces costs for public and private usage of water for sprinkling purposes.

3. When Digital Sun's product was first announced in 2003, defendant Toro engaged DS to evaluate the technology – technology that defendant Toro, an industry leader in sprinkler systems, did not have and from which it would have been excluded by reason of Digital Sun's patent filings and trade secrets. So to prevent the wide scale marketing of Digital Sun's advanced technological product, and its taking over of the market for the wireless sensor system, defendant Toro embarked on a plan or scheme to neutralize DS as a competitor and to acquire its intellectual property so that instead Toro could monopolize this new product market, wireless sensor sprinkler systems.

4. Every year from 2004-2010, as set forth in more detail below, defendant Toro engaged in some bad faith negotiation with plaintiff DS with the purpose of achieving the takeover of the DS intellectual property which it finally accomplished and through which it now threatens to monopolize the wireless

- 2 -

COMPLAINT

sensor sprinkler market.

## II.

## THE PARTIES

5. Plaintiff **DIGITAL SUN** ("DS") is a privately held corporation existing under and virtue of the laws of the State of California with its principal place of business located in San Jose, California. DS is the creator and was the leading provider of the wireless sensor sprinkler technology for both commercial and residential use.

6. Defendant **THE TORO COMPANY** is a corporation existing under and by virtue of the laws of the State of Delaware with its principal place of business located in Bloomington, Minnesota.

## III.

## JURISDICTION AND VENUE

7. Count One of this Complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26, respectively) to recover damages caused by, and to secure injunctive relief against, the named defendant for violations of Section 2 of the Sherman Act (15 U.S.C. § 2), as alleged herein.

8. This Court has supplemental jurisdiction over the claims asserted in Counts Two and Three based on California law pursuant to 28 U.S.C. § 1367 in that those claims arise out of the same body of operative facts and occurrences as Count One. Moreover, the Court has original jurisdiction over the claims asserted in Counts Two and Three under 28 U.S.C. §§ 1331, 1337.

9. Defendant maintains an office and transacts business on a systematic and continuous basis with this District and may be found here within the meaning of 15 U.S.C. § 15, 22 and 28 U.S.C. § 1391. Further, many of the unlawful acts alleged herein with perform and occurred within this District.

/ / /

/ / /

## IV.
## INTERSTATE COMMERCE

10. The actions complained of in Count One herein have restrained and adversely affected interstate trade and commerce in that both DS and Toro sell their products and services across state lines. Unless restrained by this Court, those adverse effects on interstate trade and commerce will continue.

## V.
## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

11. For purposes of plaintiff's antitrust claim set forth in Count One below, the relevant product market is wireless sensor sprinkler systems that have characteristics and uses which are not reasonably interchangeable with wired or other kinds of sprinkler systems.

12. For purposes of plaintiff's antitrust claim set forth in Count One below, the relevant geographic market is the United States.

13. With sales of more than $1.5 billion in 2009, defendant Toro is a leading worldwide provider of turf and landscape equipment and precision irrigation systems. Up through 2003, Toro had not created, or otherwise had access to, a wireless sensor sprinkler system.

14. Up to 2003 the traditional automatic sprinkler system was wired and connected to a timer that would water on a repetitive schedule which was "blind" to changes in environmental conditions that affect soil moisture, including rain, humidity and sun. Such traditional systems would turn on the sprinklers even in conditions that did not require or warrant more water with the result that they wasted, over time, thousands of gallons of water because they would run at times when water was not needed.

15. In 2003, DS introduced its S Sense wireless sensor sprinkler system which operates similar to a thermostat in that its breakthrough technology continuously monitors the moisture in the soil and communicates wirelessly with a

COMPLAINT

receiver to manage the water needed to keep landscapes healthy and green. S Sense is, therefore, a highly effective way to reduce the cost of water as compared with traditional, wired inefficient sprinkler systems.

16. The patented S Sense system consists of a wireless sensor inserted in the ground and a receiver that connects to any existing automatic sprinkler system controller. The S Sense can be installed into an existing sprinkler system by anyone in just a few minutes.

17. When in 2003 the S Sense was introduced to the market, defendant Toro recognized its potential for success and the potential it had to reduce the value of its timer-based line of automatic sprinklers. Accordingly, it contacted DS to arrange for an evaluation of the DS technology.

18. In 2004, Toro, acting in bad faith without any intention to perform, offered to acquire DS for $16.8 million, payable as follows: $4.5 million up-front, $4.3 million when sale of the product commenced, and $8 million in two installments of $4 million each when sales reached the $50 million and then $100 million level. The agreed upon transaction also involved bridge loans to DS for $350,000 at 10% interest. Later in 2004, Toro repudiated this offer because it claimed that it did not do an adequate market forecast.

19. Nonetheless, in 2005, shortly after it repudiated the acquisition offer, Toro, again acting in bad faith without any intention to perform, proposed to DS that it would invest $1 million on October 7, 2010. A Letter of Intent was executed, but once again, Toro rescinded.

20. These phony negotiations over a period of at least one year seriously weakened DS, preventing it from seeking legitimate sources of capital or partnerships with other entities in the irrigation industry and left it in a weakened and vulnerable position.

21. Then in 2006, Toro, still again acting in bad faith without any intention to perform, entered into a "Supply Agreement" under which DS would

- 5 -
COMPLAINT

manufacture product (S Sense systems) for Toro at a negotiated price. Toro was given a five (5) year exclusive on the largest retail chains that sold sprinkler systems, Home Depot, Lowes, True Value, Ace Hardware and Orchard Supply Hardware. Toro agreed to and did pay DS $300,000 up-front for this exclusive arrangement and agreed to but never did pay DS another $300,000 on the first sell through of 30,000 units at the rate of $10 per unit. Toro, pursuant to its plan and scheme, never did consummate the initial 30,000 unit purchase for resale to its exclusive retail chain customers. The reason the Toro purchase of the 30,000 units did not occur was because Toro to accomplish its plan made numerous design changes to the product, then kept forcing additional redesigns and delaying implementation of the "Supply Agreement." This deliberate conduct by Toro further weakened DS and made it yet more vulnerable.

22. Now about 4 years post-introduction of its S Sense, DS was virtually out of funds, had been unable because of the Toro bad faith negotiations to raise capital or to deal with other industry members, was in default on the earlier loan by Toro of $350,000 and was largely at Toro's mercy. So Toro was able to step in for the kill. It proposed a "License Agreement" which DS had little alternative but to accept in order to survive and avert bankruptcy. This License Agreement provided that DS would cede to Toro all of its patent portfolio related to S Sense (wireless sensor technology) and Toro would "graciously" forgive the $350,000 indebtedness into which Toro had induced DS. As a result of this License Agreement Toro accomplished its nefarious scheme and could post a "mission accomplished" sign because it now had control of the valuable DS patent portfolio and patent applications as well.

23. Within a few days of acquiring the DS patent portfolio and applications, Toro acquired a company known as Turf Guard, a manufacturer of wireless soil moisture sensor, and its intellectual property portfolio as part and parcel of its plan to monopolize the market. Turf Guard's product is different from DS S Sense in

that (a) it is just a wireless sensor which sends messages a Toro irrigation computer that controls the irrigation whereas S Sense adds smart control to existing residential and commercial irrigation control devices without the assistance of a computer, (b) Turf Guard is designed specifically for golf courses and not residential and commercial lawns, (c) Turf Guard's product requires professional installation while S Sense can be installed and serviced by consumers, (d) Turf Guard is much more (about 10 times) expensive than S Sense and (e) Turf Guard can only operate in the United States whereas S Sense can operate internationally as well as in the United States.

24. In the summer of 2008 DS completed product development of the S Sense to Toro's specifications and in October 2008, Toro started a field trial of the product.

25. In January 2009, Toro expressed interest again to purchase DS.

26. In March 2009, after its field trials had been concluded, Toro formally accepted the DS product as complete. However, in order to keep DS in a weakened state, Toro continued to refuse to place any purchase orders pursuant to the 2006 Supply Agreement.

27. In May 2009, Toro makes a new offer to acquire a devastated DS: $500,000 up-front and 15% of the revenues from the product. Through the summer of 2009, the parties are engaged in heavy negotiations on this proposal and in October 2009, the parties sign a Letter of Intent, which as usual, Toro signed in bad faith with no intention of performing. The terms of this first Letter of Intent were: the purchase of DS stock (not assets) for $750,000 up-front, with payments of $750,000 in annual installments over four (4) years; and DS would receive some royalties based on sales revenues from the product (even if Toro made the product). Toro committed to spend $1 million in marketing the product. The total potential dollar value of this phony "offer" was at least $1,500,000, or less than 10% of what was originally "offered" in 2004.

- 7 -

COMPLAINT

28. The next month, November 2009, as had now become customary, Toro terminated the agreement alleging that it had miscalculated the "build of materials" or unit manufacturing cost (as opposed to the market forecast, the excuse used the first time around).

29. Then in December 2009, sensing its prey, Toro made a vastly reduced "offer" of purchase that was also made in bad faith without any intention to perform. This one consisted of $750,000 up-front and $300,000 for two years and 20% of the net profits from the product.

30. But wait, in January 2010, Toro laid the foundation to terminate the phony "offer" of December 2009 by again suggesting there were "Build of Materials" issues that justified termination.

31. Then again, in April 2010, Toro formally terminated the December 2009 purchase agreement and even demanded that DS pay its legal fees. DS refused these demands. Toro then made a ridiculous proposal to settle the whole matter under which it would retain the extremely valuable patents and patent application belonging to DS and would forgive $24,500 owed by DS from the December 2009 transaction.

32. Toro is now making and selling its **own** wireless sensor sprinkler systems utilizing, of course, the technology it unlawfully acquired (stole) from DS, as described in Paragraphs 17-31, inclusive.

## VI.

## COUNT ONE

**(Attempted Monopolization in Violation of Section 2 of the Sherman Act)**

33. Plaintiff hereby realleges and incorporates by reference each allegation set forth in Paragraphs 1-32, inclusive, with the same force and effect as though set forth in full herein.

34. Defendant Toro has undertaken the acts described in Paragraphs 1-32, inclusive, with the specific and deliberate purpose and intent of monopolizing the

market for wireless sensor sprinkler systems in the United States. Defendant Toro specifically intended to secure control of that market by acquiring the DS patents and patent applications under which Toro would be able to exclude competition and control prices for wireless sensor sprinkler systems. Toro's scheme was specifically designed to exclude competition from that market and, in particular, to suppress and eliminate DS as an actual and potential competitor.

35. The DS patents and patent applications, plus the complex technology, and the first entrant advantage all operate as significant and high barriers market entry and will serve to preclude or discourage new entrants from entering the relevant market.

36. Toro has no legitimate business justification or efficiency justifications for the conduct alleged in Paragraphs 1-32. Indeed, such conduct was undertaken with the specific nefarious intent of crushing DS and emerging with a patent monopoly on the S Sense technology – an objection which it had a reasonable probability of achieving and, in fact, it has achieved. Accordingly, defendant Toro has violated and is now violating Section 2 of the Sherman Act, 15 U.S.C. § 2.

## VII.
### (Effects of Toro's Conduct)

37. The acts and practices alleged in Paragraphs 1-32 herein have had, and unless enjoined and undone by this Court, will continue to have the following anticompetitive and injurious effects that have produced "antitrust injury":

    a. competition in the market for wireless sensor sprinkler systems has been monopolized or is in danger of being monopolized and competition within that market has been already suppressed and virtually eliminated;

    b. consumers will be deprived of choice in selecting wireless sensor sprinkler systems and will be required to pay higher prices for those systems; and

    c. competitors in the development, manufacture and sale of wireless sensor sprinkler systems have been precluded from competing and earning profits

on such systems.

## VIII.

### (Injury to Plaintiff DS)

38. By reason of, and as a direct and proximate result of defendant Toro's conduct as described herein in Paragraphs 1-32, inclusive, plaintiff DS has suffered and will continue to suffer, financial injury to its business and property in that it has been deprived of the revenue and profits it would otherwise have made and a loss of its good will and going concern value. DS has not yet calculated the precise amount of those losses and cannot now estimate with precision the present and future damages to which it is entitled. When it does so, plaintiff DS will ask leave of Court to insert the amount of damages sustained herein.

## IX.

### COUNT TWO

### (Fraud)

39. Plaintiff hereby realleges and incorporates by reference each allegation set forth in Paragraphs 1- 32, inclusive, and Paragraph 38, with the same force and effect as though set forth in full herein.

40. The conduct described in Paragraphs 1-32 were false and were undertaken with the specific intent and deliberate intent of misleading, deceiving and weakening DS so that DS had no choice but to knuckle under to Toro. Accordingly, such conduct in Paragraphs 17-32 constitutes actionable fraud.

41. DS has relied on Toro's representations and promises to perform each of the agreements alleged in Paragraphs 1-32. At the time of the representations and promises made by Toro, DS was ignorant of the falsity of the representations and promises and believed them to be true. In reliance upon those representations and promises, DS was induced to refrain from negotiations with others to either raise capital or otherwise fund its operations. Had DS been aware of the true facts, it would have acted differently with respect to conducting its business.

COMPLAINT

42. DS' reliance on the representations and promises of Toro were justified because of DS' reasonable expectation that a large, prestigious international entity such as Toro would abide the terms of its representations and promises.

43. In doing the fraudulent acts alleged herein, Toro acted with oppression, fraud and malice, thereby depriving DS of additional business, profit and goodwill and entitling DS not only to its compensatory damages, but also to punitive damages in amount to be determined at trial but in an amount sufficient to punish and make an example of Toro.

## COUNT THREE

**(Unfair Competition in Violation of Calif. Bus. & Prof. Code § 17200)**

44. Plaintiff hereby realleges and incorporates by reference each allegation set forth in Paragraphs 1-32, inclusive, with the same force and effect as though set forth in full herein.

45. The acts and practices of Toro as alleged in Paragraphs 1-32 herein constitute "unfair business practices" within the meaning of Section 17200 of the California Business and Professions Code because they significantly threaten harm to competition and are in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

46. Those acts by Toro have caused harm to plaintiff DS, to the competitive process and to consumers so that they are "unfair" within the meaning of the statute.

47. Plaintiff DS is specifically entitled to restitution, i.e., to have its patent portfolio and patent applications secured by Toro through unlawful practices as alleged in Paragraphs 1-32 inclusive, returned to it so that Toro is not unjustly enriched by its deceptive, fraudulent, unfair, anticompetitive and wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff DS prays that this Court adjudges and decrees as

follows:

1. That the conduct alleged in Count One herein be adjudged to be in violation of Section 2 of the Sherman Act (15 U.S.C. §2);

2. That the conduct alleged in the Count Two herein be adjudged to be actionable fraud;

3. That the conduct alleged in Count Three herein be adjudged to be unfair and/or unlawful business practice in violation of Section 17200 of the California Business & Professions Code;

4. That, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), plaintiff recover treble the amount of its damages sustained by reason of those federal antitrust violations;

5. That, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), plaintiff be awarded a reasonable attorneys' fee and costs of litigation;

6. That, pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), defendant be ordered to return to plaintiff DS its patents and patent applications;

7. That, under Count Two plaintiff be awarded punitive or exemplary damages on its fraud claim;

8. That, pursuant to Section 17203 of the California Business and Professions Code, the unfair and/or unlawful business practices of defendant be permanently enjoined and plaintiff secure restitution of its patents and patent applications; and

9. For such other and further relief that the Court deems just and proper.

Dated: October 7, 2010

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
HAROLD R. COLLINS

By: _____
Maxwell M. Blecher
Attorneys for Plaintiff Digital Sun

# 43760

DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury pursuant to Federal Rules of Civil Procedure, Rule 38(b) (28 U.S.C. Rule 38) and Local Rule 3.4.10.

Dated: October 7, 2010

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
HAROLD R. COLLINS

By: _____
Maxwell M. Blecher
Attorneys for Plaintiff Digital Sun

# 43760